O

```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION


CONTINENTAL INSURANCE COMPANY,   §
                                 §
     Plaintiff,                  §
                                 §
v.                               §     CIVIL ACTION NO. H-03-4350
                                 §
SAIA MOTOR FREIGHT LINE, INC.,   §
                                 §
     Defendant.                  §
```

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

**Findings of Fact**

**Agreed Findings of Fact**

**The parties have mutually agreed to the following findings of fact, which the Court adopts:**

1.   Plaintiff Continental Insurance Company ("Continental") is the subrogated insurer of Franklin Electric Co., Inc. ("Franklin"), which owned the cargo of electric motors made the basis of this lawsuit at all times relevant to this lawsuit.

2.   Defendant SAIA was the trucker which issued a through bill of lading for the transportation of the cargo from Wilburton, Oklahoma, to Monterrey, Mexico.

3.   Plaintiff Continental's insured, Franklin, contracted with Defendant SAIA to carry a cargo of electric motors from Wilburton, Oklahoma, to Monterrey, Mexico.

4.   Twenty-four (24) cases were loaded aboard SAIA's truck at Franklin's facility in Wilburton, Oklahoma, on or about August 16, 2002.

5.   The Defendant SAIA issued bill of lading 128368 to Franklin covering the cargo, dated August 16, 2002.

6.   The cargo arrived in Laredo on or about August 19, 2002, and no exceptions were taken on the delivery receipt.

7.   The cargo subsequently was moved across the border to the Nuevo Laredo yard of Consolidacion y Transportation (CyT), a Mexican trucker with which SAIA had an Interline Agreement for transportation in Mexico.

8.   On or about September 4, 2002, during the course of transportation, the CyT truck carrying the electric motors crashed in Mexico.

9.   Following the accident, the cargo was returned to CyT's yard in Nuevo Laredo.

10.  The electric motors were returned to Franklin's facility in Wilburton, Oklahoma, on or about October 10, 2002.

11. Several electric motors were stacked on top of each other with no packaging between them for the return shipment.

12. The 4-inch electric motors were manufactured in Siloam Springs, Arkansas, packaged in individual boxes, placed on pallets, shrink-wrapped, loaded onto a trailer not owned or operated by SAIA, and transported by truck to Wilburton, Oklahoma, before SAIA received the goods.

13. Franklin did not unwrap the palletized and shrink-wrapped 4-inch electric motors in Wilburton, Oklahoma, before SAIA received the goods.

## Additional Findings of Fact

**From a preponderance of the evidence, the Court additionally finds as follows:**

14. Franklin has a 97% share of the market in the types of motors that were in this shipment, and has well-established shipping and quality control procedures in place, and a favorable history of problem-free customized packaging to deliver its products both in the United States and abroad.

15. In preparing the motors for shipment to Mexico, Franklin employed its well-established shipping and quality control procedures to assure that the cargo of electric motors was tendered to SAIA in good order and condition in 24 cases, which in part contained 567 4-inch submersible electric motors individually boxed

and then stacked on pallets and secured with five to seven layers of shrink-wrap, the extra layers of shrink-wrap being an additional precaution taken for the shipment of goods to Mexico to assure their safe delivery.

16.  Franklin tendered the cargo of electric motors to SAIA in good order and condition at Franklin's facility in Wilburton, Oklahoma, on or about August 16, 2002, and SAIA issued a clean bill of lading.

17.  When the truck carrying the electric motors crashed in Mexico on or about September 4, 2002, at least one side of the trailer carrying the motors fell away and electric motors and cargo were strewn over the highway and adjacent areas.

18.  The consignee did not receive the cargo in Mexico, and SAIA returned it to Franklin in Wilburton, Oklahoma, in severely damaged condition.

19.  Any incremental damages sustained by the motors after the accident in Mexico, both during their return to Franklin and before the damages were surveyed in April, 2003, were inconsequential in view of the severe damage that the motors sustained when the truck went out of control and crashed in Mexico.

20.  In addition to the 567 4-inch motors, the shipment included seven larger sized motors that were packed in wooden crates, which protected those seven motors from being damaged beyond repair.

21. Of the 567 4-inch electric motors on shrink-wrapped pallets, only several in perhaps three or so of the 24 cases remained palletized and shrink-wrapped.

22. A representative sample of approximately 25% of the cargo was surveyed and the overwhelming number of motors were found to be damaged beyond repair. The overwhelming majority of the 567 4-inch electric motors were damaged beyond repair.

23. None of the motors in the three or so cases that remained palletized and shrink-wrapped was included in the representative sample of motors that was surveyed for damage.

24. The several motors remaining in their packaging on the shrink-wrapped pallets consisted of no more than 15% of the total number of motors that were delivered to SAIA in good order and condition.

25. Plaintiff has established by a preponderance of the evidence that 85% of the 567 4-inch submersible electric motors, or 481 of these motors, were damaged beyond repair.

26. Had the 481 electric motors been delivered undamaged to the consignee in Monterrey, Mexico, their value would have been $68,751.

27. A sum of $346.00 was received for salvage value of the damaged electric motors, which sum was fair and reasonable.

28. The cost of repairing and re-crating the seven larger crated motors, which could be repaired, was $639.42 each, for a total of

$4,475.94, and the average fair market value of each of these motors was $1,070.00.

29. Import and export taxes for re-shipping the goods amounted to $3,062.96, which were reasonably foreseeable consequential damages.

30. The total of the above itemized damages suffered by Plaintiff, as established by a preponderance of the evidence and after allowance for salvage value obtained, is $75,943.90.

31. Continental has not proved when it paid the damages to Franklin, which would be the commencement date for Continental to receive pre-judgment interest, but it appears from the record that this date was no later than April 23, 2004, when Franklin moved at the instance of SAIA to substitute Continental as the real party in interest. *See* Document No. 13.

32. Continental is entitled to recover pre-judgment interest on its damages from April 23, 2004, to today's date of Judgment, in the amount of $3,004.75.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1. The Court has jurisdiction of the parties and the subject matter. 28 U.S.C. §§ 1331, 1337.

2. Venue properly lies in this district and division.

3.     The Carmack Amendment to the Interstate Commerce Act makes initial motor carriers liable for actual loss of or damage to shipments transported from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.  49 U.S.C. § 14706(a)(1).

4.     SAIA contracted to provide transportation of the shipment of electric motors from the United States to Mexico under a through bill of lading.  The parties did not expressly waive application of the Carmack Amendment to their shipping contract in accordance with 49 U.S.C. § 14101(b)(1), and therefore, the Carmack Amendment's provisions were incorporated into the shipping contract. Accordingly, the Carmack Amendment governs this shipment.  49 U.S.C. § 14706(a)(1).

5.     A prima facie case is established under the Carmack Amendment upon proof by a preponderance of the evidence of: (1) delivery of the goods to the carrier in good condition; (2) receipt by the consignee of less goods or damaged goods; and (3) the amount of damages.  Hoskins v. Bekins Van Lines, 343 F.3d 769, 778 (5th Cir. 2003); Accura Sys., Inc. v. Watkins Motor Lines, Inc., 98 F.3d 874, 877 (5th Cir. 1996) (citing Missouri Pac. R.R. Co. v. Elmore & Stahl, 84 S. Ct. 1142, 1145 (1964)).

6.     Once the prima facie case is established, a presumption of negligence operates against the carrier.  Frosty Land Foods Int'l, Inc. v. Refrigerated Transp. Co., 613 F.2d 1344, 1346 (5th Cir.

1980). The burden of proof shifts to the carrier to show by a preponderance of the evidence (1) that it was not negligent, and (2) that the damage to the cargo was caused solely by one of the five excepted causes: (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; or (e) the inherent vice or nature of the goods. *See* id.; Missouri Pac., 84 S. Ct. at 1144-45.

7.  If the carrier cannot meet this burden, the carrier is liable for the actual value of the lost or damaged goods. Id.

8.  A clean bill of lading is prima facie evidence of delivery in good order and condition, but a bill of lading with an "apparent good order" clause is evidence "only as to those portions of the shipment which are visible and open to inspection." Accura, 98 F.3d at 878. If goods are delivered to the carrier already packaged, secured to pallets, and shrink-wrapped, such that the goods are obscure to the carrier, a clean bill of lading may not, in itself, be sufficient proof of delivery in good condition. *See* id.

9.  Circumstantial evidence can be used to show delivery in good condition. Accura, 98 F.3d at 878; Frosty, 613 F.2d at 1347. Evidence of general shipping practices and quality control may support a finding of delivery in good condition, as may evidence of packaging materials in good condition upon delivery to the carrier but in damaged condition upon arrival to the consignee and evidence

of a history of problem-free packaging.  *See* Accura, 98 F.3d at 878-80; Frosty, 613 F.2d at 1347.

   10.  A plaintiff need not test every single one of the goods in a shipment for damage.  Rather, "the extent and amount of damages to an entire shipment may be extrapolated from a representative sampling."  S.C. Johnson & Son v. Louisville & Nashville R.R. Co., 695 F.2d 253, 259 (7th Cir. 1982).  "A sampling will be accepted as proof of damages when 'a reasonably representative sampling has been taken and so long as the sample is sufficient to indicate fairly the quality, condition and nature of damage to the whole cargo.'"  Allied Tube & Conduit Corp. v. S. Pac. Transp. Co., 211 F.3d 367, 372 (7th Cir. 2000) (quoting S.C. Johnson, 695 F.2d at 259).

   11.  "Once damage and fault have been shown, the carrier has the general burden of proving that the plaintiff could have reasonably mitigated its damages."  Frosty, 613 F.2d at 1349; *see also* Allied Tube, 211 F.3d at 372.

   12.  "The Carmack Amendment is 'comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.'"  American Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Frieght Sys., 325 F.3d 924, 931 (7th Cir. 2003) (quoting Southeastern Express Co. v. Pastime Amusement Co., 57 S. Ct. 73, 74 (1936)).  Recoverable damages include damages

9

for delay, lost profits (unless they are speculative), and all reasonably foreseeable consequential damages. American Nat'l, 325 F.3d 931 (citing cases); Air Prods. & Chems., Inc. v. Ill. Cent. Gulf R.R. Co., 721 F.2d 483, 485 (5th Cir. 1983) (stating that the Carmack Amendment "likewise impos[es] liability upon the carrier for all reasonably foreseeable consequential damages resulting from a breach of the contract of carriage, including those resulting from nondelivery of the shipped goods as provided by the bill of lading.").

13.  The ordinary measure of damages in Carmack Amendment cases is the difference between the market value of the goods in the condition in which they should have arrived at their destination and their market value in the condition in which they actually arrived.  See American Nat'l, 325 F.3d at 931-32; Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight Lines, Inc., 661 F.2d 761, 764 (9th Cir. 1981).  "When this measure is employed, the shipper is still obligated to pay freight to the carrier and will not be allowed to recover freight in his damages." American Nat'l, 325 F.3d at 932.  "The reasoning for this rule is straightforward: The price of the freight, as well as all necessary costs to the shipper such as insurance and taxes, will be figured into the market rate at destination.  By receiving the market rate of the goods had they been undamaged less the market rate received in their damaged condition, the shipper has received exactly what he

10

would have received had the carrier performed non-negligently." <u>Id.</u>

14. "However, there are instances when freight may be recovered. The typical case is when the entire shipment is destroyed or useless, but also when the measure of damages used is the shipper's cost (as determined by his cost, the invoice price, or market rate at shipment) less the market rate as damaged." <u>American Nat'l</u>, 325 F.3d at 932-33 (citations omitted). "The reason for including freight in the measure of damages when the shipper's cost (or the market value at place of shipment) is employed as the starting point is that the Carmack Amendment allows recovery of lost profits under the ordinary measure of damages," and it can be assumed "that the shipper at least would have been able to recover in the market at destination his freight, taxes, fees and insurance in addition to the price he paid for the commodity." <u>Id.</u> at 933.

15. In other words, a plaintiff may recover freight, taxes, fees and insurance only for the portion of the shipment that was damaged and only to the extent those costs are not accounted for in the market value of the goods. *See* <u>id.</u> at 935.

16. Because Continental has not shown that its valuation of the damaged motors was based on Franklin's costs, as distinguished from the retail value of the motors upon delivery if they had not been damaged, Continental has not shown itself to be entitled to recover

11

Franklin's freight costs as an element of its damages and no fact finding was made on freight costs.

17. SAIA did not limit its liability under the Carmack Amendment in accordance with 49 U.S.C. § 14706(c)(1)(A).

18. An insurer, as subrogee, is entitled only to indemnity for its payment to the insured, and therefore prejudgment interest is computed from the date that the insurer paid the claim of its insured, not from the date of the insured's injury. *See* American Nat'l, 325 F.3d at 937.

19. Continental as Franklin's subrogee is entitled to recover from SAIA damages in the amount of $75,943.90, plus pre-judgment interest in the amount of $3,004.75, for a total judgment of $78,948.65.

20. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such; and if any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 23rd day of June, 2005.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE